[No. A044137. First Dist., Div. Three. Nov. 30, 1990.]

H. R. PLATE et al., Plaintiffs, v.
SUN-DIAMOND GROWERS OF CALIFORNIA, Defendant and
Appellant;
ROBERT McELROY et al., Defendants and Respondents.

COUNSEL

Thelen, Marrin, Johnson & Bridges, Janet F. Bentley and Lydia A. Ochoa for Defendant·and Appellant.

Michael F. Babitzke for Defendants and Respondents.

OPINION

**STRANKMAN, J.**—The subject of this appeal is the application of Corporations Code section 317, subdivision (e)(4),[1] providing for court-ordered indemnification of an agent of a corporation against any judgment arising from the agent's performance of his or her corporate duties. By this action,

---

[1] All further statutory references are to the Corporations Code unless indicated otherwise.

plaintiffs, H. R. Plate and H. R. Plate & Company, Inc. (Plate), sought damages for breach of contract and unfair competition against appellant, Sun-Diamond Growers of California (Sun-Diamond), a corporation, and Robert McElroy and Richard Branson (respondents here), who were former employees of Sun-Diamond, among others. A jury rendered a verdict in favor of Sun-Diamond but against McElroy and Branson. Thereafter, upon application of McElroy and Branson pursuant to section 317, subdivisions (b) and (e)(4), the trial court ordered Sun-Diamond to indemnify these former employees against the judgment. Sun-Diamond appeals from the order of indemnification.

We conclude the record fails to support the trial court's findings that the prerequisites for indemnification under section 317 were met. We accordingly reverse.[2]

## I. *Background Facts*

Sun-Diamond is a corporation owned by four food cooperatives, which serves as an administrative and sales organization for approximately sixty thousand growers who comprise the four cooperatives. Plate is an industrial commodity food broker and was the exclusive broker for Sun-Diamond products in Northern California. Between 1977 and 1985, Plate developed his Sun-Diamond brokerage account from five to one hundred eighteen customers. In late 1984, Plate was the number two Sun-Diamond broker in the United States, measured by volume of business developed and dollar sales.

McElroy was a sales manager with Sun-Diamond who acted as a liaison between Sun-Diamond management and the brokers. Plate was one of approximately 14 brokers who reported to McElroy. Branson was the industrial marketing manager for all of Sun-Diamond's products.

Donald Soetaert and James Santo, defendants in the underlying litigation, were Sun-Diamond's vice-president of sales and marketing, and director of sales and marketing for industrial products, respectively. Branson and McElroy reported to Santo.

Plate's "broker profile," listing his customers' names, addresses, products used and approximate volume of each of those products, was maintained in the industrial sales department where Branson and McElroy both worked. McElroy regularly conferred with Plate and met with Plate's major customers.

---

[2] By separate order, we deny respondents' motion to dismiss the appeal.

Until 1983, Plate had never received any criticism of his brokerage services from anyone at Sun-Diamond. In July 1983, McElroy delivered a letter reprimanding Plate for making sales for competitors of Sun-Diamond. Plate responded to the letter, stating that there were special circumstances justifying each of the sales listed in the letter.

Because of McElroy's letter, Plate was placed on six months' probation ending January 1984. He successfully cleared the probationary period. At that time, McElroy met with Plate and told him he wanted to become a partner in Plate's business. Plate told him the business was too small.

In January 1985, McElroy discussed with Plate's son the possibility of his leaving Sun-Diamond and taking the Sun-Diamond account away from Plate. Thereafter, making use of information regarding Plate's accounts to which they had access, Branson and McElroy began planning to establish their own brokerage business. Branson testified that he took a look at Plate's broker profile in February 1985, once he began considering going into the brokerage business.

In the first week of April 1985, Branson and McElroy both took vacations to finalize their plans to set up their own brokerage business. They did not want to reveal their plans to anyone at Sun-Diamond until they were ready to ask for the Sun-Diamond account. Branson testified that between January 1985 and May 1985 he did not discuss his desire to go into the brokerage business with anyone at Sun-Diamond "[b]ecause it would be considered by [Sun] Diamond management a conflict of my interest and probably they would think that I was not whole-heartedly behind my work at Sun Diamond. And therefore I suspect I would have been fired or that sort of thing."

On April 29, 1985, McElroy wrote a letter to Plate in which he accused Plate of having "play[ed] games instead of trying to work within the system," and other criticisms. Plate testified that McElroy made these accusations for the first time in this letter.

In the latter part of May 1985, McElroy and Branson told Santo for the first time that they were going into the brokerage business and asked if Sun-Diamond would appoint them as its industrial brokers for Northern California. After Branson and McElroy gave Sun-Diamond a firm departure date, Santo and Soetaert discussed the benefits and detriments of replacing Plate. They decided that McElroy and Branson would be better representatives for Sun-Diamond in Northern California, as they had more knowledge

of the products than any other brokers Santo and Soetaert knew. In addition, they did not want Branson and McElroy working for the competition.

On June 6, 1985, Santo terminated Plate. Branson and McElroy remained at Sun-Diamond until June 28, 1985. In July 1985, Branson and McElroy began their brokerage business with Sun-Diamond as their only account.

## II. *Procedural Background*

On March 21, 1986, Plate initiated this action against Sun-Diamond, McElroy, Branson, Santo, and Soetaert. The first amended complaint stated a cause of action against Sun-Diamond for breach of contract; causes of action against McElroy and Branson for intentional interference with contract and intentional interference with prospective economic advantage; and causes of action against all defendants for conspiracy to induce breach of contract and conspiracy to interfere with prospective economic advantage.

As discussed in more detail, *infra,* in June 1986, it was determined that counsel for Sun-Diamond would undertake representation of all five defendants, and Sun-Diamond would bear the costs of litigation. Branson and McElroy inquired as to who would be responsible for an adverse judgment rendered against them. Counsel for Sun-Diamond responded with a letter stating that Sun-Diamond would indemnify them to the extent required by section 317 against liabilities arising from the litigation.

The case proceeded to jury trial. Following the submission of the case to the jury, the jury returned a special verdict exonerating Sun-Diamond, Santo, and Soetaert as against all claims, but finding Branson and McElroy liable for intentional interference with contract, intentional interference with prospective economic advantage, and conspiracy to interfere with prospective economic advantage. The jury awarded damages against these two defendants in the amount of $275,968. On February 8, 1988, a judgment was entered accordingly.

Following the entry of judgment, Branson and McElroy sought indemnification from Sun-Diamond against the judgment. On April 27, 1988, the Sun-Diamond board of directors advised them that Sun-Diamond declined to indemnify. Branson and McElroy then filed a motion for indemnification pursuant to section 317, subdivision (e)(4). Following a hearing, the trial court ordered indemnification, stating in its written decision: "The motion of defendants Branson and McElroy for indemnification is granted. [¶] The Court finds each of said defendants was an agent of Sun Diamond within the meaning of Section 317 of the Corporations Code, and each acted in

good faith and in a manner each believed to be [in] the best interests of the corporation." Sun-Diamond filed a motion for reconsideration of this order, which was denied on October 5, 1988.

### III.  *Section 317*

Section 317, added to the Corporations Code in 1975, provides in pertinent part: "(a) For the purposes of this section, 'agent' means any person who is or was a director, officer, employee or other agent of the corporation . . . ; 'proceeding' means any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative; and 'expenses' includes without limitation attorneys' fees and any expenses of establishing a right to indemnification under subdivision (d) or paragraph (4) of subdivision (e). [¶] (b) A corporation shall have power to indemnify any person who was . . . a party to any proceeding . . . *by reason of the fact that the person is or was an agent of the corporation*, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with the proceeding *if that person acted in good faith and in a manner the person reasonably believed to be in the best interests of the corporation* and, in the case of a criminal proceeding, had no reasonable cause to believe the conduct of the person was unlawful . . . ."

Subdivision (d) of section 317 provides that a corporation *must* indemnify an agent if he or she has been successful on the merits in defense of a proceeding arising out of his or her performance of corporate duties.

Subdivision (e) prescribes four different methods by which a corporation may obtain authorization to make an indemnification payment to a person entitled to indemnity under the statute (even if that person did not prevail in the defense of an action), including court authorization, as follows: "(e) [A]ny indemnification under this section shall be made by the corporation only if authorized in the specific case, upon a determination that indemnification of the agent is proper in the circumstances *because the agent has met the applicable standard of conduct set forth in subdivision (b) or (c)*, by any of the following: . . . (4) The court in which the proceeding is or was pending upon application made by the corporation or the agent or the attorney or other person rendering services in connection with the defense, whether or not the application by the agent, attorney or other person is opposed by the corporation." (Italics added.)

Section 317 corresponds in part to language in chapter 8 of 2 American Bar Association Model Business Corporation Act Annotated (3d ed. 1987 supp.) pp. 1114-1115, 1126 (2 MBCAA) as do indemnification statutes in other states. ██ The policy considerations behind these statutes are that

persons who serve the corporation in good faith should, in the absence of certain conduct (fraud, breach of fiduciary duties, etc.) be free from liability for corporate acts; indemnification encourages capable persons to perform their duties, secure in the knowledge that expenses incurred by them despite their honesty and integrity will be borne by the corporation. (See Bishop, Law of Corporate Officers and Directors Indemnification and Insurance (1982) § 6.02[1], p. 53; 2 MBCAA, *supra*, (1989 cum. supp.) § 6.02[1], p. 8, citing *McLean* v. *International Harvester Co.* (5th Cir. 1987) 817 F.2d 1214, 1222.)

The first prerequisite to indemnification under section 317, subdivision (b), is that the action against the person is brought "by reason of the fact that the person is or was an agent of the corporation." ▮ Marsh, in his treatise on California corporation law, explains: "In other words, the conduct of the agent which gives rise to the claim against him must have been performed in connection with his corporate functions and not with respect to purely personal matters." (1 Marsh, Cal. Corporation Law (2d ed.) § 9.36, p. 536.) Where personal motives, not the corporate good, are predominant in a transaction giving rise to an action, indemnification is not warranted. For example, "[i]t would . . . appear unlikely that an officer could properly claim that he was entitled to indemnification as the result of litigation brought to recover short-swing profits or profits from trading in the stock of his corporation on the basis of inside information . . . ." (Heyler, *Indemnification of Corporate Agents* (1976) 23 UCLA L.Rev. 1255, 1258, fn. 24.)

Sister-state authorities illustrate this rule. In *Tomash* v. *Midwest Technical Development Corp.* (1968) 281 Minn 21 [160 N.W.2d 273, 277-278], where the Minnesota indemnification statute contained the "by reason of the fact" requirement, the court held that directors seeking indemnification for defending themselves in an SEC proceeding stemming from their personal investments in certain stock, did not meet the requirement because the statute "speak[s] in terms of indemnification to one who defends himself as a director or officer of the corporation" whereas "the officers and directors [seeking indemnification] were defending themselves from alleged violations of the Investment Company Act, from which they personally profited. The two are not the same." (*Ibid.*)

In *Petty* v. *Bank of New Mexico Holding Co.* (1990) 109 N.M. 524 [787 P.2d 443, 446-448], directors of a corporation were signatories to a buy-sell and voting trust agreement relating to the corporation's stock. An action was brought against the directors in their capacity as signatories to the agreement, for a determination of the price at which shares of stock would be bought and sold pursuant to the agreement. The corporation authorized reimbursement of its directors' legal costs incurred in the defense of this

litigation. A shareholder, objecting to the expenditure of corporate funds for legal services to defend the actions and advance the private interests of the directors as signatories to the buy-sell agreement, brought a shareholder's derivative suit challenging indemnification.

The Supreme Court of New Mexico held its state's corporate indemnification statute did not bar the derivative suit where the complaint alleged the directors were not made parties to the other litigation by reason of the fact that they were directors of the corporation, but rather because they were signatories to the buy-sell and voting trust agreement. The court reasoned: "The purpose of the [indemnification] legislation is to encourage qualified individuals to accept the responsibilities of corporate management without fear that expenses incurred by them in performing their duties as directors will not be borne by the corporation . . . . To expand the list of persons entitled to claim the benefit of indemnification to include [persons] who are litigating questions [relating to their private interests] for their own private benefit, would go far beyond th[e] purpose of the statute." (*Petty* v. *Bank of New Mexico Holding Co., supra,* 787 P.2d at p. 448.)

■ The remaining prerequisites to indemnification, that the agent acted in good faith and with a reasonable belief that the activity was in the best interests of the corporation, allow for indemnification even where the agent was negligent or committed some error. (See Marsh, *supra,* § 9.42, p. 545.)

The statute, however, prohibits indemnification in cases of bad faith or intentional wrongdoing, because: "Indemnification, if permitted too broadly, may violate . . . basic tenets of public policy. It is inappropriate to permit management to use corporate funds to avoid the consequences of wrongful conduct or conduct involving bad faith. A director, officer, or employee who acted wrongfully or in bad faith should not expect to receive assistance from the corporation for legal or other expenses and should be required to satisfy not only any judgment entered against him but also expenses incurred in connection with the proceeding from his personal assets. Any other rule would tend to encourage socially undesirable conduct." (2 MBCAA, *supra,* Introductory Com., p. 1082.)

Of course, if the corporate agent is acquitted of any wrongdoing, he or she has a right to indemnification for legal expenses incurred for his or her defense, even though he or she was initially charged with bad faith or intentional misconduct. (§ 317, subd. (d).)

If the agent is not vindicated, he or she may still seek indemnification, provided the good faith requirement can be met. (Marsh, *supra,* § 9.42, p. 546.)

Marsh provides examples illustrating this rule: "For example, the agent might be held liable under Rule 10b-5 for a fraud perpetrated on some third party by other officers or directors of the corporation merely because he [or she] did not take the action which a court later holds was required of him to prevent the fraud." (Marsh, *supra*, § 9.42, p. 547.) The authority authorizing indemnification may make the required finding that he or she acted in good faith and thus is entitled to indemnification. This could not be done, however, where the facts indicate that the agent intentionally participated in illegal activity or wrongful conduct against third persons. "For example, corporate executives who participate in a deliberate price-fixing conspiracy with competing firms could not be found to have acted in good faith, even though they may have reasonably believed that a deliberate flouting of the antitrust laws would increase the profits of the corporation." (*Ibid.*)

## IV.  *Standard of Review*

■    The question of whether a corporate agent is sued by reason of his or her official corporate position, and whether he or she acted in good faith and for the best interests of the corporation, appears to be an essentially factual question for the trial court. The trial court's factual findings, express or implied, must be upheld if supported by substantial evidence. (See *Fed-Mart Corp.* v. *Pell Enterprises, Inc.* (1980) 111 Cal.App.3d 215, 221 [168 Cal.Rptr. 525].) In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the trial court's findings. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

■    Notwithstanding the deferential standard of review, however, the trial court, in making its determination, was bound by the judgment rendered against Branson and McElroy, including the jury's findings necessary to its verdict against these defendants. (See 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, §§ 216, 253, 254, pp. 653, 691, 693 [issues actually or necessarily adjudicated in prior action accorded collateral estoppel effect].) The trial court had instructed the jury that Plate had the burden of proving as to Branson and McElroy, that "these defendants intentionally committed unjustified or wrongful acts designed to interfere with or disrupt the contractual relationship between Plate Co. and Sun-Diamond." The jury's verdict against Branson and McElroy therefore necessarily included a finding of intentional wrongdoing committed by these defendants against a third party.

## V. *Analysis*

A. *Prerequisites for indemnification under section 317, subdivision (b), were not met.* ■ We conclude the trial court's implicit finding that Branson and McElroy were sued by reason of the fact they were agents of Sun-Diamond, and express finding that they acted in good faith, are not supported by substantial evidence.

The record establishes these defendants were sued because of activity undertaken to establish their own business entirely independent of Sun-Diamond, for their own personal benefit, and not in furtherance of Sun-Diamond's policies or objectives. Such activity was unrelated to the performance of their corporate duties and responsibilities at Sun-Diamond. Indeed, Branson testified that they delayed informing Sun-Diamond of their plans because such plans would be viewed as creating a conflict of interest with their job performance at Sun-Diamond. Branson and McElroy thus were sued in their capacity as individuals pursuing their personal interests, and not by reason of the fact they were agents of Sun-Diamond. There simply is no evidence to support a finding that the first prerequisite to indemnification under section 317, subdivision (b), was met.

As to the second prerequisite, the jury's finding that the conduct giving rise to the action consisted of intentional wrongdoing committed against a third party precludes a finding that Branson and McElroy acted in good faith. That such wrongdoing did not harm or was not against the best interests of the corporation does not establish that the defendants acted in good faith in participating in the wrongful conduct. In *Olivet v. Frischling* (1980) 104 Cal.App.3d 831 [164 Cal.Rptr. 87], the court stated that when an agent "induces a breach [of contract to which the principal is a party] in the hopes that he himself might fill the resultant economic void, he acts not as a servant, i.e., as one upholding his master's best interests, but rather as a naked competitor, devoid of the protections accorded those who labor under standards of fidelity, good faith and fiduciary responsibility." (*Id.*, at p. 841.)

For these reasons, we conclude there is insufficient evidence to support the trial court's findings that the prerequisites to indemnification under section 317, subdivision (b), were met. The trial court therefore erred in ordering indemnification.

B. *Letter relating to indemnification does not compel Sun-Diamond to indemnify.* As above-stated, after the complaint was filed, Sun-Diamond, with the acquiescence of Branson and McElroy, retained counsel for the

defense of all defendants, and bore all costs of litigation. In connection with the motion for indemnification, the following evidence was adduced pertinent to the understanding of the parties as to Sun-Diamond's obligation, if any, to indemnify for additional liabilities arising from the litigation. Following service of the summons and complaint, Gary Marshburn, a Sun-Diamond officer, told Branson and McElroy that Sun-Diamond would pay all costs associated with the defense. Sun-Diamond retained George Barron to represent all five defendants. At that time, Branson sent a letter to Babitzke, his personal business attorney, stating: "Enclosed is a copy of the summons served on Sun-Diamond Growers . . . . Although Bob and I are named in the suit, Sun-Diamond's Assistant Secretary, Gary Marshburn, told us that we will be covered by Sun-Diamond's liability since we were under their employ at the time." In deposition, Sun-Diamond's counsel inquired of Branson pertaining to this letter, "Q. . . . Did you mean by that Sun-Diamond's liability insurance? [¶] A. I don't know. I just wrote what he told me, and that's all he said. I don't know whether it was restrictive to insurance or not."

Thereafter, McElroy's personal attorney, Charles Hastings, reviewed Branson's letter to Babitzke and suggested obtaining another letter from Sun-Diamond pertaining to indemnification. In or about December 1986, McElroy and Branson contacted George Barron, defense counsel retained by Sun-Diamond, and requested a letter with "a little bit stronger verbiage" pertaining to Sun-Diamond's indemnification of Branson and McElroy. Barron's response was that he knew for certain that Sun-Diamond would cover all attorney fees, but as to responsibility for any judgment, he would have to check with Sun-Diamond. Between that time and July 23, 1987, Branson discussed the issue of indemnification with Barron at length on three or four occasions. Branson told Barron that he would have a hostile defendant on his hands if they did not receive the letter.

Finally, Barron obtained authorization from Sun-Diamond's general counsel to provide a letter to Branson and McElroy pertaining to indemnification. The letter, dated July 23, 1987, stated: "I have been authorized to inform you that Sun-Diamond Growers of California intends to indemnify you to the extent required by California Corporations Code Section 317 against liabilities, including attorneys fees and costs, that may arise out of the case of H. R. Plate, et al. v. Sun-Diamond Growers, et al., Contra Costa County Superior Court No. 284052." Branson and McElroy questioned Barron concerning the meaning of the letter. Barron responded that Sun-Diamond would continue to pay for attorney fees, but that with respect to anything else, "the letter spoke for itself." Barron suggested that if they had further questions concerning section 317 they should consult with someone else.

■ The foregoing evidence fails to establish the existence of an indemnification agreement obligating Sun-Diamond to indemnify Branson and McElroy independent of the requirements of section 317. The July 23, 1987, letter plainly stated that Sun-Diamond would indemnify "to the extent required" by section 317. There is no evidence that either Barron or anyone else on behalf of Sun-Diamond misrepresented the conditions or prerequisites to corporate indemnification under section 317. The argument of Branson and McElroy that Sun-Diamond is bound to indemnify them, regardless of whether the requirements of section 317 were met, must therefore fail.

## VI. *Disposition*

The order of indemnification is reversed. Sun-Diamond to recover costs on appeal.

White, P. J., and Merrill, J., concurred.

Respondents' petition for review by the Supreme court was denied February 28, 1991. Baxter, J., did not participate therein.